## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.   18-80102-CR-ROSENBERG/REINHART

UNITED STATES OF AMERICA

v.

MARK JEFFREY HOLLANDER,

     Defendant.

_____/

FILED by _____ D.C.

SEP 13 2018

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

### PLEA AGREEMENT

The United States Attorney's Office for the Southern District of Florida ("this Office") and Mark Jeffrey Hollander (hereinafter referred to as the "defendant"), enter into the following agreement:

1.    The defendant agrees to plead guilty to the Information, which charges that the defendant engaged in a monetary transaction affecting interstate commerce, by, through, and to a financial institution, in criminally derived property of a value greater than $10,000, that is, property derived from health care fraud and health care fraud conspiracy; in violation of Title 18, United States Code, Sections 1957 and 2.

2.    In consideration of the undertakings contained herein, this Office agrees that it will not pursue any additional charges under 18 U.S.C. §§ 1347, 1349, 1956, and 1957 related to the defendant's involvement in criminal activity in the Southern District of Florida that is known to this Office at the time the parties entered into this agreement.

3.    The defendant is aware that the sentence will be imposed by the Court after considering the Federal Sentencing Guidelines and Policy Statements (hereinafter "Sentencing Guidelines"). The defendant acknowledges and understands that the Court will compute an

1

advisory sentence under the Sentencing Guidelines and that the applicable guidelines will be determined by the Court relying in part on the results of a Pre-Sentence Investigation by the Court's Probation Office, which investigation will commence after the guilty plea has been entered. The defendant is also aware that, under certain circumstances, the Court may depart from the advisory sentencing guideline range that it has computed, and may raise or lower that advisory sentence under the Sentencing Guidelines. The defendant is further aware and understands that the Court is required to consider the advisory guideline range determined under the Sentencing Guidelines, but is not bound to impose that sentence; the Court is permitted to tailor the ultimate sentence in light of other statutory concerns, and such sentence may be either more severe or less severe than the Sentencing Guidelines' advisory sentence. Knowing these facts, the defendant understands and acknowledges that the Court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offense identified in paragraph 1 and that the defendant may not withdraw the plea solely as a result of the sentence imposed.

4.     The defendant also understands and acknowledges that, as to Count 1, the Court may impose a maximum term of imprisonment of ten (10) years, to be followed by a term of supervised release of not more than three (3) years, and may impose a fine of up to $2,062,397.54.

5.     The defendant further understands and acknowledges that, in addition to any sentence imposed under paragraph 4 of this Agreement, a special assessment in the amount of $100 will be imposed on the defendant. The defendant agrees that any special assessment imposed shall be paid at the time of sentencing.

6.     This Office reserves the right to inform the Court and the Probation Office of all facts pertinent to the sentencing process, including all relevant information concerning the offenses committed, whether charged or not, as well as concerning the defendant and the defendant's

background. Subject only to the express terms of any agreed-upon sentencing recommendations contained in this Agreement, this Office further reserves the right to make any recommendation as to the quality and quantity of punishment.

7.     This Office and the defendant agree that, although not binding on the Probation Office or the Court, they will jointly recommend that the Court make the following findings and conclusions as to the sentence to be imposed:

a.     that the defendant's Offense Level should be calculated pursuant to U.S.S.G. § 2S1.1;

b.     that pursuant to USSG § 2S1.1(a)(2), the defendant's Base Offense Level should be 8 plus 12, for a total of 20, because the value of the laundered funds was more than $250,000 and less than $550,000;

c.     that the defendant's offense level should be increased by one level, pursuant to USSG § 2S1.1(b)(2)(A), because the defendant was convicted under 18 U.S.C. § 1957;

d.     that the defendant's offense level should be reduced by two levels, pursuant to USSG § 3E1.1(a), based upon the defendant's recognition and affirmative and timely acceptance of personal responsibility; and

e.     if, at the time of sentencing , the defendant's offense level is determined to be 16 or greater, this Office will make a motion requesting an additional one-level decrease pursuant to Section 3E1.1(b) of the Sentencing Guidelines, stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting this Office to avoid preparing for trial and permitting this Office and the Court to allocate their resources efficiently;

     f.     if the Court's Probation Office and the Court calculate the advisory guideline range as set forth above, that is, with a final Total Offense Level of 18, then the parties will jointly recommend that the Court impose a sentence at the low end of the advisory guideline range; and

     g.     if the Court's Probation Office and/or the Court calculate a Total Offense Level other than 18, then the parties will jointly file a motion for variance asking the Court to impose a sentence equivalent to the low-end of the guideline range of Offense Level 18 because that sentence is reasonable, takes into account the factors set forth in 18 U.S.C. § 3553(a), and is sufficient but not greater than necessary to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2).

8.     The defendant agrees to assist this Office in all proceedings, whether administrative or judicial, involving the forfeiture to the United States of all rights, title, and interest, regardless of their nature or form, in all assets, including real and personal property, cash and other monetary instruments, wherever located, which the defendant or others to the defendant's knowledge have accumulated as a result of illegal activities. Such assistance will involve the defendant's agreement to the entry of an order enjoining the transfer or encumbrance of assets that may be identified as being subject to forfeiture. Additionally, defendant agrees to identify as being subject to forfeiture all such assets, and to assist in the transfer of such property to the United States by delivery to this Office upon this Office's request, all necessary and appropriate documentation with respect to said assets, including consents to forfeiture, quit claim deeds and any and all other documents necessary to deliver good and marketable title to said property. The defendant agrees to forfeit all interests in any money laundering-related asset that the defendant currently owns, has previously owned or over which the defendant currently, or has in the past, exercised control, directly or indirectly, and

4

any property the defendant has transferred, as well as any property that is traceable to, derived from, fungible with, or a substitute for property that constitutes the proceeds of his offense, including but not limited to the following specific property:

**$97,650.00 in United States Currency**

Defendant warrants that defendant is the sole owner of all of the property listed above, and agrees to hold the United States, its agents and employees harmless from any claims whatsoever in connection with the seizure or forfeiture of property covered by this agreement.  The defendant further promises and agrees to forfeit $97,650.00 in United States Currency at sentencing, and shall place that amount into escrow with his attorney's client-trust account not later than sixty (60) days following the change of plea.

9.     The defendant further agrees to waive all interest in any such asset in any administrative or judicial forfeiture proceeding, whether criminal or civil, state or federal.  The defendant agrees to consent to the entry of orders of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.  Defendant acknowledges that he understands that the forfeiture of assets is part of the sentence that may be imposed in this case and waives any failure by the court to advise him of this, pursuant to Rule 11(b)(1)(J), at the time his guilty plea is accepted.

10.     Defendant knowingly and voluntarily agrees to waive any claim or defense the defendant may have under the Eighth Amendment to the United States Constitution, including any claim of excessive fine or penalty with respect to the forfeited assets. The defendant further agrees

that forfeiture is independent of any assessments, fines, costs, restitution orders, or any other penalty that may be imposed by the Court.

11.     The defendant hereby waives any applicable time limits for the initiation of administrative or civil judicial forfeiture and/or further notification of any such forfeiture brought against the subject property.  The defendant further agrees to waive any appeal of the forfeiture.

12.     Limitation on Joint Sentencing Recommendations:  The defendant understands and agrees that this Office will not be required to make the motion and sentencing recommendations set forth in paragraph (7) if the defendant: (a) fails or refuses to make a full, accurate and complete disclosure to the Probation Office of the circumstances surrounding the relevant offense conduct; (b) is found to have misrepresented facts to this Office prior to entering this plea agreement that were relied upon by this Office in reaching this agreement; (c) breaches any term of this agreement; or (d) commits any misconduct after entering into this plea agreement, including but not limited to committing a state or federal offense, violating any term of release, or making false statements or misrepresentations to any governmental entity or official, including making any false statement to the Court.  The defendant further understands and acknowledges that the Court is under no obligation to accept any of this Office's or the parties' joint sentencing recommendations.

13.     Penalties for Violation of Plea Agreement:  Should the defendant violate the terms of this plea agreement by committing any additional crimes or giving false, incomplete, or misleading information or testimony, or by incriminating any innocent person, or by otherwise violating any terms or provisions of this Agreement including the waiver of the right to appeal, then this Agreement shall be void and the defendant shall thereafter be subject to prosecution for any federal criminal violation of which this Office has knowledge, including substantive health care fraud, money laundering, and other charges, and the defendant will have no right to vacate

his plea of guilty to the other charge contained in the Information. The defendant further waives any claim that such prosecution is time-barred where the statute of limitations has expired between the signing of this agreement and the commencement of any such prosecution.

14.     The defendant is aware that the sentence has not yet been determined by the Court. The defendant also is aware that any estimate of the probable sentencing range or sentence that the defendant may receive, whether that estimate comes from the defendant's attorney, this Office, or the Probation Office, is a prediction, not a promise, and is not binding on this Office, the Probation Office, or the Court. The defendant understands further that any recommendation that this Office makes to the Court as to sentencing, whether pursuant to this agreement or otherwise, is not binding on the Court, and the Court may disregard the recommendation in its entirety. The defendant acknowledges that no one has promised or guaranteed what sentence the Court will impose. The defendant understands and acknowledges, as previously acknowledged in paragraph (3) above, that the defendant may not withdraw his plea based upon (a) the Court's decision not to accept a sentencing recommendation made by the defendant and/or this Office, or (b) the fact that he received an incorrect estimate of the sentence that he would receive, whether that estimate came from his attorney, this Office, and/or the Probation Office.

15.     The defendant agrees that he has entered into this Plea Agreement freely and voluntarily, and that no threats or promises, other than the promises contained in this written Plea Agreement, were made to induce the defendant to enter his plea of guilty.

16.     The defendant is aware that Title 18, United States Code, Section 3742 and Title 28, United States Code, Section 1291 afford the defendant the right to appeal the sentence imposed in this case. Acknowledging this, in exchange for the undertakings made by this Office in this plea agreement, the defendant hereby waives all rights conferred by Sections 3742 and 1291 to

appeal any sentence imposed, including any restitution order, or to appeal the manner in which the

sentence was imposed, unless the sentence exceeds the maximum permitted by statute or is the

result of an upward departure and/or an upward variance from the advisory guideline range that

the Court establishes at sentencing.   The defendant further understands that nothing in this

agreement shall affect the government's right and/or duty to appeal as set forth in Title 18, United

States Code, Section 3742(b) and Title 28, United States Code, Section 1291.   However, if the

United States appeals the defendant's sentence pursuant to Section 3742(b) and 1291, the

defendant shall be released from the above waiver of appellate rights.  By signing this agreement,

the defendant acknowledges that he has discussed the appeal waiver set forth in this agreement

with his attorney.  The defendant further agrees, together with the United States, to request that

the Court enter a specific finding that the defendant's waiver of his right to appeal the sentence to

be imposed in this case was knowing and voluntary.

      17.   This is the entire agreement and understanding between this Office and the

defendant.  There are no other agreements, promises, representations, or understandings.

BENJAMIN G. GREENBERG
UNITED STATES ATTORNEY

Date: _9/13/18_

By: _____
A. MARIE VILLAFAÑA
ASSISTANT UNITED STATES ATTORNEY

Date: _9|13|13_

By: _____
DAVID WEINSTEIN, ESQ.
ATTORNEY FOR DEFENDANT

Date: _9|13|18_

By: _____
SAMUEL RABIN, ESQ.
ATTORNEY FOR DEFENDANT

Date: _9|13|18_

By: _____
MARK JEFFREY HOLLANDER
DEFENDANT

8

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.    18-80102-CR-ROSENBERG/REINHART

**UNITED STATES OF AMERICA**

**v.**

**MARK JEFFREY HOLLANDER,**

   **Defendant.**

_____/

FILED by _____ _FM_ ___ D.C.

SEP  3 2018

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

### FACTUAL PROFFER

Defendant Mark Jeffrey Hollander, his counsel, and the United States agree that, had this case proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt, and that the following facts are true and correct and are sufficient to support a plea of guilty:

1.     At all times relevant to the Indictment, substance abuse treatment was regulated under state and federal law.  Pursuant to Florida's Marchman Act, appropriate substance abuse treatment needed to be "a professionally directed, deliberate, and planned regimen of services and interventions that are designed to reduce or eliminate the misuse of drugs and alcohol and promote a healthy, drug-free lifestyle." Fl. Stat. 397.311(a).

2.     At all times relevant to the Indictment, the Marchman Act made it unlawful for any person or agency to act as a substance abuse service provider unless it was properly licensed. Fl. Stat. § 397.401(1); Fl. Admin. Code § 65D-300.003(1)(a).

3.     The Patient Protection and Affordable Care Act of 2010 ("ACA"), Pub. L. 111-148, and other federal laws expanded the availability of private insurance to pay for substance abuse treatment in several ways.  First, the ACA allowed parents to maintain health insurance for their children through their own insurance policies until the children reached the age of 26.  Second, federal law mandated that substance abuse treatment and other mental health treatment must be covered and reimbursed by insurance policies in the manner and at the same levels as other medical treatment. Third, the ACA required insurance companies to cover individuals regardless of prior existing conditions.  Fourth, annual and lifetime caps on coverage were removed.  Fifth, the ACA created insurance exchanges that allowed uninsured individuals to apply for and obtain coverage from private insurers.  The combination of these provisions created insurance coverage for patients and substance abuse treatment that had previously been excluded from coverage.  Federal health care benefits programs were likewise expanded.

4.      These federal laws created access to coverage through a number of avenues, including health plans sponsored by private employers, federal health care benefits programs, and health plans offered directly by private insurance companies.  Private insurance companies administer health plans sponsored by private employers and governmental employers.  Health plans sponsored by private employers are governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, while those sponsored by governmental employers and certain others are exempted from ERISA's jurisdiction.

5.      The Federal Employees Health Benefits Program ("FEHBP") provided medical benefits, items and services to federal employees and their dependents, including substance abuse services.  The United States Office of Personnel Management ("OPM") managed the FEHBP and contracted with various insurance companies to offer these benefits.  FEHBP reimbursed those insurance companies out of government funds for the money the insurance companies paid out for medical benefits, items and services for federal employees and their dependents. BlueCross/BlueShield (BCBS) was one of the various insurance companies contracted by the Office of Personnel Management to offer medical benefits, items and services to federal employees under the FEHBP.

6.      The National Railroad Passenger Corporation, doing business as Amtrak ("Amtrak"), was a private, for profit, Government corporation, that operated a nationwide system of passenger rail transportation.  As part of its employee benefits package, Amtrak established employee health and welfare benefit plans to provide healthcare to their employees, including their spouses, domestic partners, and dependent children (collectively, "dependents").

7.      Both ERISA and non-ERISA health benefit plans, including ACA plans, were offered or administered by private insurance companies, including Blue Cross/Blue Shield, Aetna, Cigna Behavioral Health, Cigna Health & Life Insurance Company, United Behavioral Health, and United Health Group.

8.      All of these health benefit plans were "health care benefit programs," as defined in Title 18, United States Code, Section 24(b), that is, "public or private plans or contracts, affecting commerce, under which any medical benefit, item or service is provided to any individual."

9.      Regardless of the type of plan held by a patient, the amount of coverage and terms and conditions of billing and payment were governed by the terms of the individual's insurance documents, and the insurance company administering the plan had the authority, responsibility, and discretion to make coverage determinations and to process and make payments on claims.

10.      Chapter 817 of the Florida Statutes, known as the "Florida Patient Brokering Act," made it a felony for any person, health care provider, or health care facility, including any licensed substance abuse service provider, to: "(a) Offer or pay any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, to induce the referral of patients or patronage to or from a health care provider or health care facility; (b) Solicit or receive any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, in return for referring patients or patronage to or from a health care provider or health care facility; (c) Solicit

or receive any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, in return for the acceptance or acknowledgement of treatment from a health care provider or health care facility; or (d) Aid, abet, advise, or otherwise participate in the conduct prohibited under paragraph (a), paragraph (b), or paragraph (c)." Fla. Stat. § 817.505.

11.     Florida law also stated that it "shall constitute a material omission and insurance fraud . . . for any service provider, other than a hospital, to engage in a general business practice of billing amounts as its usual and customary charge, if such provider has agreed with the insured or intends to waive deductibles or copayments, or does not for any other reason intend to collect the total amount of such charge." Fla. Stat. § 817.234(7)(a).

12.     Under state and federal law, health benefit plans were only responsible for claims for services that: (a) were "medically necessary," (b) were actually rendered; (c) were provided by a properly licensed service provider, and (d) complied with the terms of the health care plan, including the obligation to pay co-insurance and deductibles and to comply with state law.

13.     Bodily fluid testing could be used to detect recent drug or alcohol use by a client by conducting various tests on a client's urine, blood, and saliva. Urine Analysis or urinalysis ("UA") testing complexity ranged from screening tests – also known as point of care ("POC") testing – which provided instant results, to confirmatory testing, which was sent to a laboratory, for more complex analysis. Laboratories could also conduct complex analysis on blood and saliva samples.

14.     Like other medical tests, bodily fluid testing could be billed to insurance and reimbursed pursuant to the terms of the insurance policy. Insurance companies were only responsible for claims for testing that were "medically necessary," actually performed, prescribed, and conducted by a properly licensed service provider, and conducted and billed in compliance with the terms of the health care plan, including the obligation to pay co-insurance.

15.     Defendant Mark Jeffrey Hollander ("Hollander") is a licensed real estate broker in the State of Florida and an accountant. Hollander is the owner of several companies that are located in Miami Dade County, in the Southern District of Florida. At all times relevant to the Information, Hollander worked full-time as an accountant, but did not work as an accountant in connection with the entities discussed below. Hollander had no training or experience in urinalysis testing, the clinical laboratory business, or any aspect of substance abuse treatment.

16.     Reflections Treatment Center (Reflections) was located at 5100 Coconut Creek Parkway, Margate, Florida, in Broward County, in the Southern District of Florida. Reflections purported to operate as a licensed "substance abuse service provider" or "treatment center" that is, it purportedly offered clinical treatment services for persons suffering from alcohol and drug addiction. Laura Chatman was the nominee owner of Reflections, although Kenneth Chatman was the true owner and made all financial decisions. Due to Kenneth Chatman's felony conviction, his ownership interest was not disclosed to the State of Florida and, thus, Reflections was not properly licensed.

17.     Smart Lab LLC (Smart) is located at 10385 Ironwood Road, Suite 130, Palm Beach Gardens, Florida, in Palm Beach County, in the Southern District of Florida. Smart offers bodily fluid

testing services including confirmatory urinalysis testing. In or around September 2015, Reflections started using Smart to perform urine confirmatory drug testing after Kenneth Chatman was paid a bribe to begin using Smart's services and was promised kickbacks in exchange for referring all of Reflections' urinalysis testing to Smart.   To facilitate these kickbacks, Smart paid "sales representatives" a "commission" for each urine sample that Reflections and other treatment facilities referred to the lab for testing. These payments to the sales reps were actually illegal kickbacks paid directly or indirectly to owners or employees of treatment facilities that were disguised as sales commissions.

18.     To maximize the kickbacks, Smart prepared "standing orders" and recommended that Reflections and other entities run every available urinalysis test three times per week.  Reflections used medical directors who were willing to sign these standing orders even though the tests were not medically necessary and were not used to direct the patients' medical treatment.  Smart submitted claims to numerous health benefit plans for the unnecessary and excessive urinalysis testing.  Smart also was aware that many of the urine samples from Reflections and other entities were not legitimate, that is, the testing revealed that samples did not come from the stated patients.  Despite knowing this, Smart submitted these fraudulent claims to the health benefit plans and received proceeds in interstate commerce that were deposited into Smart's bank account at Wells Fargo Bank.

19.     On or about December 21, 2015, Hollander signed an employment agreement with Smart that purported to make Hollander a sales representative for Smart.  This agreement was used to make it appear that monies paid by Smart to Hollander were for services rendered.  In truth and in fact, the majority of the wages and commissions Smart paid to Hollander were simply passed through to a third party, L.F.  The employment contract between Hollander and Smart was created to hide the true purpose and recipient of the payments.

20.     From approximately January 20, 2016 through January 20, 2017, Smart paid Hollander $1,031,198.77. From that amount, Hollander used between $250,000 and $550,000 for his personal benefit.  These payments came from proceeds of specified unlawful activity, that is, health care fraud and health care fraud conspiracy, and include check number 2315, dated May 3, 2016, payable from Smart Lab LLC's Wells Fargo bank account number XXXXXX1499, to Mark Hollander, in the amount of $97,650.  Hollander deposited this check into his personal Wells Fargo Bank account number XXXXXX6223.  Hollander then disbursed the funds from this account per L.F.'s instructions.

21.     The proceeds of the health care fraud scheme were deposited into bank accounts that the defendant had at Wells Fargo Bank and other financial institutions.  Wells Fargo is a domestic financial institution as defined by federal law involved in interstate commerce, and the defendant's deposit and disbursement of the funds to and through Wells Fargo affected interstate commerce.

22.     Mark Hollander then conducted transactions from the Wells Fargo Bank account and other accounts to make payments on behalf of L.F. who then made kickback payments to Chatman and others in exchange for sending urine drug testing to Smart.

BENJAMIN G. GREENBERG
UNITED STATES ATTORNEY

Date: 9/13/18                    By: _____
                                 A. MARIE VILLAFAÑA
                                 ASSISTANT UNITED STATES ATTORNEY

Date: 9|13|13                    By: _____
                                 DAVID WEINSTEIN, ESQ.
                                 ATTORNEY FOR DEFENDANT

Date: 9/13|13                    By: _____
                                 SAMUEL RABIN, ESQ.
                                 ATTORNEY FOR DEFENDANT

Date: 9|13|13                    By: _____
                                 MARK JEFFREY HOLLANDER, DEFENDANT